Leibensperger, Edward P., J.
INTRODUCTION
Plaintiff, Insituform Technologies, Inc., brings this negligence action arising out of the failure of a sewer pipe lining designed by defendant, Jacobs Civil, Inc. Jacobs moves for summary judgment on Insituform’s claims, arguing that the action is barred by the applicable statute of limitations. In addition, Jacobs contends that the negligence claim is barred by the economic loss rule and that the evidence in the record is insufficient to support Insituform’s negligent misrepresentation claim. Insituform opposes this motion, and moves to strike several of the exhibits submitted in support of Jacobs’s Undisputed Statements of Fact. For the reasons that follow, Insituform’s motion to strike is DENIED, and Jacobs’s motion for summary judgment is ALLOWED.
BACKGROUND
The following is a summary of the undisputed statements of fact in the record, viewed in the light most favorable to Insituform, the non-moving party. The Massachusetts Water Resources Authority (“MWRA”) initiated a project to rehabilitate the East Boston sewer branch. This project was known as the East Boston Branch Sewer Relief Project (the “Project”) . The MWRA contracted with Jacobs on March 15, 2000, to provide preliminary design, final design, and resident engineering services for the Project.
The parties dispute whether Jacobs engaged a sub-consultant to design elements of the cured-in-place-pipe (“CIPP”) liner and to prepare bid documents related to the Project. The parties agree, however, that the plans for the liner were finalized by October 2002, and that on December 19, 2002, bids for the project were opened and read aloud. The MWRA awarded the *385 project to D’Allessandro Corp. on March 14,2003, and issued a Notice to Proceed with work on April 7, 2003. D’Allessandro’s contract was valued at approximately $5.1 million and called for substantial completion by February 1, 2004.
The MWRA’s specifications for the Project called for the use of CIPP liner technology that involved relining an existing pipe with a resin-impregnated felt material. On April 24, 2003, D’Allessandro engaged Insituform as the subcontractor to supply and install the CIPP liner for a contract price of approximately $1 million. Insituform specializes in sewer rehabilitation through the use of trenchless pipeline technologies. It is recognized as the world leader and a pioneer in the CIPP sewer relining industry. Jacobs and Insituform dispute the scope of Insituform’s obligations under the subcontract and the scope of information made available to subcontractors prior to the bid.
Insituform and D’Allessandro were obligated under Specification §02713 and subsection 1.01(A) to perform the following work:
1. Furnish all labor, materials, transportation, and equipment necessary to rehabilitate existing East Boston Branch Sewer combined sewer, by means of installation of a cured-in-place (CIPP) lining.
2. Design, Manufacture and Delivery of CIPP Lining Material.
3. Install CIPP Lining into Host Conduit.
4. Reinstate connections as indicated on the Contract Drawings from within CIPP.
The parties dispute the final specifications of the CIPP liner, Jacobs contending that the original specifications govern and Insituform contending that the original specifications were modified by Addendum #4.[1]
The dispute between these parties involves a disagreement as to which party was responsible for selecting a circular design, as opposed to a more expensive beam design, for lining the East Boston Branch Sewer. The parties agree that at some point, D’Allessandro advised Insituform’s project manager, Tom Porzio, that:
I think ITI has to submit on the best liner for the project. You are professionals and have to certify the liner to work. If in fact the beam is a better design and will give the pipe more longevity then that is the best rout[e] to go. The engineers will have a hard time not accepting in’s certified design.
On June 5,2003, Insituform formally submitted its CIPP liner design proposal utilizing the circular design pursuant to specifications. The proposal included certificates of compliance signed by Eugene Zaltsman, Insituform project engineer, verifying that the Insituform tubes used in the project will comply with specification, ASTM F1216, and that the resins to be used (AOC 102NA and AOC 7-5810-PM) meet the “chemical resistance recommendations of ASTM F1216.” Per Specification §02173 and subsection 1.05(B)(1)(d), Insituform provided a Certificate of Design signed by Brian Dorwart, a professional engineer, certifying that Insituform’s design complied with Specification §02713 and was “in conformance with all applicable local, state, and federal codes, rules and regulations and professional practices standards.”
Insituform installed the liner in six pieces (called “shots”) during August and September 2003. During an inspection performed in September or October 2003, Insituform discovered numerous leaks and defects in the first five shots of the liner.[2] On October 6, 2003, representatives of MWRA, Jacobs, Insituform and others met “to determine the cause and possible solutions to the leaks discovered in the Cured-In-Place Pipe liner installed by Insituform ...” Memorandum of CIPP deficiencies meeting, October 6, 2003.[3] On October 8, 2003, Insituform’s project manager, Tom Porzio, sent an internal email to Insituform employees, noted as “URGENT,” referencing the current problem of “over 200 leaks in the liner.”[4] In the weeks that followed, there were more meetings and discussions regarding the leaks in the pipes and the possible repairs. Jacobs reinspected the CIPP liner on October 28-29, 2003, after Insituform had made repairs, and discovered that these repairs had proved unsuccessful.
On October 31, 2003, Jacobs issued a Non-Conformance Report No. 2 to D’Allessandro. The report referenced the meetings that had included representatives of Insituform and concluded that the liner with the repairs made to it does not meet the contract requirements. Jacobs asserted that the defects remained spread throughout the entire liner reach. Throughout November 2003, Insituform continued to investigate the cause of defects and the appropriate repair. At a December 5, 2003, meeting among Jacobs, MWRA, Insituform and others, appropriate repair of the CIPP liner was again discussed. On December 12, 2003, Insituform’s project manager, Porzio, emailed D’Allessandro with the name and phone number of Insituform’s general counsel in response to D’Allessandro expressing concern about a potential lawsuit.[5] On December 29, 2003, Insituform gave notice to its insurer of a potential claim by MWRA arising from the failed installation of the sewer liner. The insurer denied coverage to Insituform and on March 10, 2004, Insituform commenced a lawsuit seeking coverage for “loss suffered as a result of defects discovered in Insituform’s work that were [sic] rejected by” MWRA. Complaint, CA#04-10487, USDC Mass. Insituform proceeded to cany out the reinstallation of the liner in five of the six shots from January through March 2004, achieving substantial completion on May 11, 2004.
During the course of the one-year inspection on March 21-22, 2005, Insituform discovered that the portion of the liner that had not been replaced in 2004, *386 Shot 5, had buckled. On May 20, 2005, Insituform, by its project manager, Porzio, wrote to Jacobs concerning Shot 5. Insituform stated “(w)e believe the original design specified was not the appropriate design for this shape pipe” and “reiterated” the “suggestion of May 2003 that an alternative design calculation and resin be used for the new liner.”[6] In August 2005, Insituform installed a new liner in Shot 5.
Insituform commenced an action against Jacobs in Suffolk Superior Court on May 10, 2007, asserting negligence and negligent misrepresentation claims related to the design of the CIPP liner utilized for the Project.[7] That complaint sought damages related to the cost of repairing and replacing the damaged CIPP liner. On October 31, 2008, Insituform and Jacobs entered into a tolling agreement under which Insituform would dismiss its 2007 complaint, without prejudice, and all causes of action would be tolled until ninety days after the resolution of Insituform’s separate action against its insurer. Insituform ultimately failed on its claim against the insurer and that action was dismissed on September 21, 2009. Insituform filed the present action against Jacobs on October 14, 2009, reasserting claims of negligence and negligent misrepresentation.
DISCUSSION
Summary judgment is granted when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c). The moving party may prevail on its motion by demonstrating by reference to materials properly in the summary judgment record, unmet by countervailing materials, that the party bearing the burden of proof at trial has no reasonable expectation of proving an essential element of its case. Carey v. New England Organ Bank, 446 Mass. 270, 278 (2006), citing Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). With respect to a statute of limitations defense, once defendant establishes that an action is commenced beyond the applicable time period allowed by the statute, the burden falls to the plaintiff to prove facts that would take the case outside the bar of the statute of limitations. Silvestris v. Tantasqua Regional School District, 446 Mass. 756, 766-67 (2006). To survive summary judgment, the non-moving party must set forth specific facts with affidavits, deposition testimony, answers to interrogatories, or admissions on file showing that a genuine issue of fact exists. Mass.R.Civ.P. 56(e); Ng Bros. Constr., Inc. v. Cranney, 436 Mass. 638, 644 (2002).
I. Plaintiffs Motion to Strike
Insituform moves to strike seven exhibits (Exhibits 29, 30, 34, 36, 49, 50, and 54) submitted in support of Jacobs’s motion for summary judgment. Insituform argues that the seven exhibits are “non-project” documents that constitute inadmissable hearsay and are not properly authenticated. In particular, Insituform asserts that these documents were not prepared in the ordinary course of business and, as such, fail to comply with G.L.c. 233, §78’s admissibility standard.[8] Jacobs opposes the motion, contending that the exhibits are admissions of a party and that the exhibits are properly authenticated because Insituform produced them during discovery.
All seven of the exhibits appear to have been produced by Insituform in discovery.[9] None of the documents is submitted by Jacobs pursuant to an affidavit describing the origination of the document. Mr. Porzio, on behalf of Insituform, provides, however, the basis for admissibilty of the exhibits by his affidavit. Mr. Porzio attests that all seven of the exhibits are “internal communications discussing the failed portions of the original liner.” Thus, the documents come into evidence as admissions of Insituform. See §801 (d)(2) of the Massachusetts Guide to Evidence. That Mr. Porzio also states “I do not consider these documents to be ‘project documents’ in the normal course” is irrelevant to the conclusion that the documents constitute admissions. Regardless of whether the documents are business records, as defined by the statute, they constitute admissions of a party opponent. Insituform’s motion to strike is denied.
In its responses to Jacobs’s Statement of Undisputed Facts, Insituform also interposes objections to four additional exhibits submitted by Jacobs in support of summary judgment (Exhibits 28, 32, 37 and 38). Insituform does not move to strike these exhibits but instead merely objects that the exhibits are not business records and have not been submitted by Jacobs with a supporting affidavit. Again, all of these documents appear to have been produced by Insituform in discovery. One document (Exhibit 38) is, on its face, an email from Mr. Porzio dated December 12, 2003. The document is self-authenticated. Insituform submits no affidavit denying the authenticity of the document. See Sanchez v. Financial Enters. Corp., 1996 WL 1250622 at *2 & n.3 (Mass.Super. 1996) (White, J.) [5 Mass. L. Rptr. 421] (considering exhibits, responses to requests for document production, submitted without affidavit testimony in support, where opposing party did not dispute accuracy of the documents). Thus, Exhibit 38 is admissible as a party admission. The court will not rely upon any of the other three exhibits (Exhibit 28, 32 and 37) for purposes of summary judgment.
II. Defendant’s Motion for Summary Judgment
Jacobs contends that Insituform’s claims of negligence and negligent misrepresentation are barred by the operation of the applicable statute of limitations. Specifically, Jacobs asserts that Insituform knew or should have known it had a potential claim against Jacobs in October 2003, but did not file its lawsuit until May 10, 2007, more than three and a half years later. Insituform maintains that because of the complexity of the Project, it could not have discovered that Jacobs’s alleged negligent design was the cause of its *387 injury until an independent expert completed a report about the Project in 2006. Further, Insituform argues that the Shot 5 failure did not occur until sometime in March 2005. As a result, Insituform says, at least the portion of its lawsuit dealing with the failure of Shot 5 should be deemed timely filed. Jacobs responds that Insituform had an obligation to discover the defect in Shot 5 before it buckled in March 2005, because the defect was the same alleged defect that resulted in the injury to the other parts of the liner discovered in 2003.
The parties agree that the statute of limitations applicable to plaintiffs claims is G.L.c. 260, §2B:
Actions of tort for damages arising out of any deficiency or neglect in the design, planning, construction, or general administration of an improvement to real property of a public agency . . . shall be commenced only within three years next after the cause of action accrues . . .
Once a defendant raises the statute of limitations as an affirmative defense and establishes that the action was brought more than three years from the date of injury, the plaintiff has the burden of proving facts that take the case outside the statute of limitations. With respect to actions subject to G.L.c. 260, §2B, “[plaintiffs who assert that their cases should not be barred by the statute of limitations have the burden of demonstrating that they did not know of the defect within the statute of limitations and that ‘in the exercise of reasonable diligence, they should not have known.’ ” Albrecht v. Clifford, 436 Mass. 706, 715 (2002) (citation omitted); White v. Peabody Construction Co., Inc., 386 Mass. 121, 129 (1982) (“In negligence cases the general rule has been that the cause of action accrues at the time of injury... The language of G.L.c. 260, §2B, clearly establishes some variant of the discovery rule for design and construction negligence cases”) (citations omitted).
The Supreme Judicial Court has established that “[t]he notice required is not notice of every fact which must eventually be proved in support of the claim . . . Rather, ‘notice’ is simply knowledge that an injury has occurred.” Id. at 130. Further, the Court explained that “[t]he plaintiff need not know the full extent of the injury before the statute starts to run.” Bowen v. Eli Lilly & Co., 408 Mass. 204, 207-08 (1990) (plaintiff needs to possess “knowledge or sufficient notice of what the cause of the harm was”). Accordingly, the “controlling question is whether a plaintiffs knowledge, actual or attributed, of both harm to it and the likely cause of such harm, was sufficient to stimulate further inquiry which was likely to alert it to a cause of action against a defendant.” Hanson Hous. Auth. v. Dryvit Sys., Inc., 29 Mass.App.Ct. 440, 446 (1990). See also Cohen v. State St. Bank & Trust Co., 72 Mass.App.Ct. 627, 632 (2008) (reasoning that judge correctly rejected plaintiffs claim that cause of action did not accrue until he retained an expert, because such a theory would provide a plaintiff “unilateral control” over accrual of the cause of action based on retention of expert).
Massachusetts courts consistently hold that discovery of defect or loss following the completion of a construction project provides a plaintiff with sufficient notice of a defect in either the construction or design associated with a project. See White, 386 Mass. at 130 (plaintiff “should reasonably have known that widespread water leaks in a newly constructed building are almost certainly the result of design or construction defects” on date such leaks were discovered, rather than date that cause of the leaks was finally determined); Fine v. Huygens, Dimella, Shaffer & Assocs., 55 Mass.App.Ct. 1114 at *3-4 (2002) (unpublished) (irregularities in building exterior reported to condominium managers in invoices provided sufficient notice of defective construction tp start accrual of statute of limitations prior to waterproofing firm’s final report to managers), rev’d in part, 57 Mass.App.Ct. 397, 405-06 (2003) (affirming statute of limitations analysis); Hanson, 29 Mass.App.Ct. at 444-46 (plaintiff should have known of potential negligence associated with construction or design of exterior wall system when caulking started falling out between joints, the finish coat began to crack, and two large cracks appeared on the exterior wall, all three years before the plaintiff engaged expert to conduct testing as to cause).[10]
Here, Insituform, a sophisticated world leader in the sewer relining industry, had notice of hundreds of leaks in five out of six parts of the liner by October 2003, when it conducted an inspection of the Project. In the months that followed, Insituform investigated the leaks, proposed a plan of repair and completed the repair. By December 2003, it was on notice of a potential lawsuit from MWRA as a result of defects in the sewer lining. In March 2004, Insituform commenced a lawsuit against its insurer seeking coverage for the losses it expected to incur. Without doubt, Insituform was on notice of a defect in the design or construction of the Project throughout this period. All of these dates are more than three years before the commencement of Insituform’s lawsuit against Jacobs.
In accordance with the White, Hanson, and Fine cases, Insituform knew or should have known that its injury was almost certainly, caused by defective construction or design of the CIPP liner. Insituform had three years to complete its investigation to determine whether to sue Jacobs. There was nothing inherently unknowable about the cause of Insituform’s injury. Nevertheless, it failed to commence suit in a timely manner. As a result, the statute of limitations bars the claim.
The fact that Insituform did not know the full extent of its injury, namely, the leak in Shot 5 that did not show up until March 2005, does not toll the statute of *388 limitations as to the negligent design claim as to Shot 5. The leak in Shot 5 is alleged by Insituform to have occurred as a result of the allegedly improper original design by Jacobs.[11] That is the same claim against Jacobs that could have been discovered by Insituform within three years of the 2003 failures. The fact that the failure in Shot 5 did not show up until 2005 does not mean that Insituform was unaware of its injury from negligent design back in 2003. See Harris v. McIntyre, 2000 WL 942559 at *7 (Mass.Super. 2000) (Gants, J.) (stating that “notice of one problem that may result from a design or construction defect may provide notice as to another problem likely to emanate from the same design or construction defect” and reasoning that separation of stairs from foundation provided plaintiff notice of settlement defects and fact that balcony did not begin to sag until later did not toll limitations period, as injury emanated from same settlement defects). Because Insituform was on inquiry notice of its negligent design claim in 2003, it is immaterial that it did not “learn of the full dimensions of the problem until a later date.” Beaconsfield Townhouse Condominium Trust v. Zussman, 49 Mass.App.Ct. 757, 762 (2000). Accordingly, Insituform’s claims are barred.[12]
ORDER
For the reasons discussed above, Insituform’s Motion to Strike is DENIED and Jacobs’ Motion for Summary Judgment is ALLOWED.

 Addendum #4 modifies the original specification by stating: "The existing conduit shall be considered to be partially deteriorated and therefore the CIPP liner shall be designed in accordance with ASTM F1216.”

 This statement of fact is set forth in Jacobs’s Statement of Undisputed Facts ¶25. Insituform disputes this Statement by simply noting “Disputed, See Insituform Statement of Material Facts ¶76.” When ¶76 is reviewed, there is no refutation or dispute of the fact set forth in ¶25. Thus, the Statement of Fact ¶25 must be deemed admitted. See Superior Court Rule 9A(b)(5)(ii). In any event, other statements of fact and supporting documents establish beyond doubt that numerous leaks were discovered in the liners by October 2003.

 Insituform disputes this statement by asserting that the quoted document is not a “business record” supported by an affidavit. The admissibility of this document is addressed in the section of this decision concerning Insituform’s motion to strike.

 Insituform also objects to the admissibility of this document. As discussed in the section of this decision concerning Insituform’s motion to strike, the objection is overruled.

 Insituform also objects to the admissibility of this document. As discussed in the section of this decision concerning Insituform’s motion to strike, the objection is overruled.

 Insituform objects to the admissibility of this document. As discussed in the section of this decision concerning Insituform’s motion to strike, the objection is overruled.

 Insituform Technologies, Inc. v. Jacobs Civil, Inc., SUCV07-02023.

 Under G.L.c. 233, §78, business records may be admitted to prove the truth of the statements they contain if they satisfy the following foundational requirements: “(1) the entiy, writing, or record was made in good faith; (2) in the regular course of business; (3) before the beginning of the civil or criminal proceeding in which it is offered; and (4) it was the regular course of such business to make such memorandum at the time of such act, transaction, occurrence, or event, or within a reasonable time thereafter.” Commonwealth v. Siny Van Tran, 460 Mass. 535, 548 (2011), citing G.L.c. 233, §78.

 The documents bear an Insituform identification number. Insituform does not deny that the documents were produced by it in discovery.

 See also Graham v. Just a Start Corp., 28 Mass. L. Rptr. 569, 2011 WL 3524405 at *6-8 (Mass.Super. 2011) (plaintiffs claim as to negligent construction accrued when she first noticed damage to her home after installation of the support beam, including shifting of stairways, cracks in basement wall, and drop in the ceiling on third floor, rather than a year later when experts provided reports indicating that the support beam caused damage to her home); Harris v. McIntryre, 2000 WL 942559 at *2-7 (Mass.Super. 2000) (Gants, J.) (statute of limitations accrued more than three years before condominium managers filed action because they had knowledge of extensive problems with water leaking into units through foundation and roof and of concrete steps pulling away from foundation).
The case that Insituform cites for the proposition that the discovery rule tolls the statute of limitations in complex cases until detailed investigation and expert analysis have concluded is distinguishable. See Doherty v. Admiral’s Flagship Condominium Trust, 80 Mass.App.Ct. 104, 108-09 (2011) (examining statute of limitations in personal injury-related negligence claim under G.L.c. 260, §2A stemming from development of toxic mold from water leakage, where presence of mold was not apparent and limitations period did not accrue until expert testing was conducted).

 insituform submitted the Affidavit of John E. Gumbel, an expert consultant. He opines that the Shot 5 failure was as a result of the original design deficiencies. See ¶5. See also, Insituform’s Memorandum of Law in Opposition to Defendant’s Motion for Summary Judgment, p.ll (“After spending a reasonable amount of time completing his investigation and reviewing the additional data with respect to Shot 5 and the rest of the liner segments, Gumbel concluded the circular liner design prepared by Jacobs caused Shot 5 to fail”).

 As an alternative ground for partial summary judgment, Insituform is precluded by the economic loss rule from recovering on its negligent design claim against Jacobs. According to this rule, if “a defendant interferes with a contract or economic opportunity due to negligence and causes no harm to either the person or property of plaintiff, the plaintiff may not recover for purely economic losses.” Garweth Corp. v. Boston Edison Co., 415 Mass. 303, 305 (1993). See FMR Corp. v. Boston Edison Co., 415 Mass. 393, 395-96 (1993); McDonough v. Whalen, 365 Mass. 506, 513-14 (1974) (economic loss rule applies to negligent design and installation claims). But see Nota Constr. Corp. v. Keyes Assocs., Inc., 45 Mass.App.Ct. 15, 20 (1998) (economic loss doctrine does not apply to negligent misrepresentation claim). “ ‘Economic loss’ in this context has been defined to include ‘damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits without any claim Of personal injury or damage to other property . . .’ ” Marcil v. John Deere Indus. Equip. Co., 9 Mass.App.Ct. 625, 630 n.3 (1980) (citation omitted). Where, as here, Insituform has presented no evidence of harm to property, aside from that to the CIPP liner, its damages amount only to economic losses. With respect to Insituform’s claim for negligent misrepresentation, numerous disputes as to the facts would preclude summary j udgment were it not for the determination that the claim is barred by the statute of limitations.